**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| KAITLYN ROSE SLAUGHTER,<br><br>                  Plaintiff,<br><br>vs.<br><br>LEXISNEXIS RISK SOLUTIONS, INC.,<br><br>                  Defendant. | Civil Action No.: 1:23-cv-02566<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Kaitlyn Rose Slaughter ("Plaintiff") a living, breathing 34-year-old consumer, by and through the undersigned counsel, brings this action on an individual basis, against Defendant LexisNexis Risk Solutions, Inc. ("LexisNexis") and states as follows:

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, LexisNexis acknowledges this potential for misuse and resulting damage every time it sells its respective services to a consumer.

1

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible

> destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of LexisNexis' blatantly inaccurate reporting, wherein LexisNexis reported to Plaintiff's potential creditors that she is "deceased."

12. Accordingly, Plaintiff brings claims against LexisNexis for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

13. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from LexisNexis for its willful and/or negligent violations of the FCRA, as described herein.

## PARTIES

14. Plaintiff is a natural person residing in Aurora, Colorado, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15. LexisNexis is a Delaware corporation doing business throughout the United States, including the State of Colorado and in this District, and has a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005. LexisNexis can be served at its registered agent, The Corporation Company, located at 40600 Ann Arbor Rd E, Suite 201, Plymouth, Michigan 48170.

16. LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### Summary of the FCRA

19. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

22. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## LexisNexis' Practices Concerning the Sale of Reports on the "Deceased"

24. LexisNexis sells millions of consumer reports (often called "credit reports" or "reports") per day.

25. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like LexisNexis, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like LexisNexis, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

27. LexisNexis routinely places a "deceased" notation or marking on reports when it is advised by any of its many data sources that a given consumer is deceased.

28. LexisNexis does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

29. LexisNexis does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

30. LexisNexis does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31.     In some cases, in order to assure accuracy, LexisNexis may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. LexisNexis does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when LexisNexis has received information suggesting the consumer is deceased before adding that information to the consumer's credit file or report.

32.     LexisNexis regularly receives or has access to the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But LexisNexis does not cross-reference the information it has received suggesting a consumer is deceased with the Death Master File in order to determine whether that consumer is also on the Death Master File before selling a credit report about said consumer, or at any time, suggesting they are deceased.

33.     LexisNexis fails to employ reasonable procedures that assure that a consumer with a "deceased" mark on her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

34.     Even in instances where other data on the face of the consumer's report indicates that she is not deceased, LexisNexis does not employ any procedures to assure that a consumer with a "deceased" mark on her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

35.     Even in instances where the purportedly deceased consumer communicates directly with the LexisNexis, LexisNexis does not employ any procedures to assure that a consumer with

a "deceased" mark on her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

36. LexisNexis knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased."

37. LexisNexis has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because LexisNexis is inaccurately reporting them as "deceased."

38. LexisNexis has received and documented many disputes from consumers complaining that LexisNexis had erroneously marked them as "deceased" on their credit reports.

39. LexisNexis knows that thousands of consumers are erroneously marked as "deceased" on their credit reports even when said consumers are not on the Death Master File and are in fact alive.

40. Nevertheless, LexisNexis does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

41. LexisNexis does not employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

42. For years after a consumer's actual death, LexisNexis will continue to sell credit reports about that consumer.

43. LexisNexis will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to it—meaning that no one is continuing to purchase reports about that consumer.

44. LexisNexis charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

8

45. LexisNexis profits from the sale of reports on deceased consumers.

46. LexisNexis knows that truly deceased consumers do not apply for credit.

47. LexisNexis knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to LexisNexis to be a common and major source of identity theft.

48. LexisNexis knows that identity theft and credit fraud are serious and widespread problems in our society.

49. LexisNexis sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

50. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the LexisNexis to sell its credit reports, absent a court order.

51. LexisNexis knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### The "Mixed File" Problem

52. A recurring and known issue within the credit reporting industry is the creation of "mixed files."

53. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

9

54. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." F.T.C. v. TRW, Inc., 784 F. Supp. 361, 362 (N.D. Tex. 1991).

55. "Mixed files" create a false description and representation of a consumer's credit history and result in the consumer not obtaining credit or other benefits of our economy.

56. LexisNexis' procedures for matching consumer information to a consumer report often cause the mixing of one consumer with another.

57. Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and LexisNexis sells information pertaining to one consumer in response to the application of the other. This violates the consumer's privacy and also greatly increases their risk of identity theft.

**Plaintiff Applied for Credit Card Pre-Approval with Capital One**

58. Plaintiff has never had a credit card in the past. In or around mid-2023, Plaintiff decided she wanted to start improving her credit and was aware that a credit card is a good way to do so.

59. On or about June 26, 2023, Plaintiff was interested in applying for a Capital One credit card in order to start building her credit.

60. Before completing her application to Capital One, on or about June 26, 2023, Plaintiff completed and submitted an online pre-approval application with Capital One for a credit card.

10

61. As part of the application process, Capital One uses consumer reports to determine whether to approve consumer credit applications. Plaintiff provided Capital One with her personal identification information, including her Social Security Number ("SSN"), and authorized it to obtain copies of her consumer reports.

### Capital One Denied Plaintiff's Credit Application

62. Upon information and belief, Capital One ordered a consumer report concerning Plaintiff from LexisNexis on or about June 26, 2023.

63. Upon information and belief, on or about June 26, 2023, LexisNexis published information concerning Plaintiff to Capital One in response to her credit application.

64. Upon information and belief, among the information that LexisNexis published to Capital One was information that inaccurately reflected that Plaintiff was "deceased."

65. On or about June 26, 2023, Plaintiff received an email indicating that she had been denied credit by Capital One because it received information indicating that Plaintiff was deceased.

66. Plaintiff – who continued to live and breathe – was perplexed by the indication that she was "deceased."

67. Upon information and belief, Capital One denied Plaintiff's credit card application based upon the contents of a consumer report LexisNexis sold about Plaintiff.

68. Upon information and belief, LexisNexis mixed Plaintiff's information with that of a deceased consumer.

69. It is inaccurate to report in a consumer report that a living consumer is "deceased."

70. Specifically, it was inaccurate for LexisNexis to publish information to a third party indicating that Plaintiff was deceased when Plaintiff is very much alive.

11

71. Plaintiff was deeply disappointed at the Capital One credit card denial. Certainly, Plaintiff was not deceased.

72. Moreover, Plaintiff found the information reported by LexisNexis to be very distressing, confusing, and shocking.

### Plaintiff Concluded That LexisNexis was the Source of the Information Capital One Received Containing a "Deceased" Notation

73. Within the denial letter that Plaintiff received from Capital One, Capital One indicated that Capital One had relied upon consumer reports obtained from non-parties, Experian, Equifax, Trans Union, and also from LexisNexis.

74. Shocked and confused by the inaccurate reporting, Plaintiff signed into her Credit Sesame account in order to pull her consumer reports.

75. Upon information and belief, in or around July 2023, Plaintiff logged into Credit Sesame and obtained reports from non-parties Trans Union, Experian, and Equifax, and learned that none of the three major credit bureaus were reporting that she was "deceased."

76. Because Plaintiff confirmed that three of the four sources of consumer credit information that Capital One received had **no** references to Plaintiff being "deceased," Plaintiff reasonably concluded that LexisNexis – the only other source of information that Capital One received – was in fact the source of the "deceased" notation.

77. Upon information and belief, in or around July 2023, LexisNexis was reporting two separate SSNs as attributed to Plaintiff.

78. In short, upon information and belief, LexisNexis was reporting an inaccurate SSN in Plaintiff's consumer report.

79. Upon information and belief, the inaccurate SSN being reported by LexisNexis and purportedly attributed to Plaintiff began with the prefix "466," and does not belong to Plaintiff.

12

80. LexisNexis had every reason to know that Plaintiff did not die, including, *inter alia*, the credit application submitted by Plaintiff as well as Plaintiff's other active credit accounts.

81. LexisNexis violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the consumer information it published and maintained concerning Plaintiff.

### Plaintiff Sustained Damages as a Result of LexisNexis' Inaccurate Reporting

82. As a direct result of LexisNexis' inaccurate consumer reporting, Plaintiff sustained severe emotional distress. Specifically, Plaintiff endured a substantial amount of stress and anxiety after being denied credit as a report of LexisNexis reporting that Plaintiff was "deceased."

83. Plaintiff has also suffered from countless nights of poor sleep, no sleep, or interrupted sleep as her mind frequently drifts to thoughts of her credit, future issues caused by LexisNexis, and/or other related matters.

84. As a result of the onset of severe stress and anxiety caused by LexisNexis, Plaintiff began taking anti-anxiety medication in order to ameliorate her symptoms.

85. As a result of the "deceased" notation, LexisNexis made it practically impossible for Plaintiff to continue to obtain credit.

86. At all times pertinent hereto, LexisNexis was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the LexisNexis herein.

87. At all times pertinent hereto, the conduct of LexisNexis, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

88. LexisNexis is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, LexisNexis' violations of the FCRA are willful.

89. As a result of LexisNexis' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of sleep; detriment to her credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

90. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

91. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

92. On numerous occasions, LexisNexis prepared patently false consumer reports concerning Plaintiff.

93. Despite actual and implied knowledge that Plaintiff is not dead, LexisNexis readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

14

94. LexisNexis violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it published and maintained concerning Plaintiff.

95. As a result of LexisNexis' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

96. LexisNexis' conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

97. Plaintiff is entitled to recover attorneys' fees and costs from LexisNexis in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

a) Determining that LexisNexis negligently and/or willfully violated the FCRA;

b) Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c) Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

d) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Date: November 28, 2023,   Respectfully submitted,

*/s/ James Ristvedt*
James Ristvedt, AZ Bar #035938
**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, AZ 85258
T: (480) 626-1956
E: jristvedt@consumerattorneys.com

*Attorneys for Plaintiff Kaitlyn Rose Slaughter*